Next matter is Grand Properties versus JPMorgan Chase. Next matter is Grand Properties versus JPMorgan Chase Mortgage Securites Trust The purpose is to enhance the value of the collateral. And once Walmart signed this lease amendment, also in the record you will see a lease expansion agreement. And what they were doing was they were taking the 141,000 square foot store, which was a regular Walmart store, and they were making it into a super center. And a super center is some sort of grand Walmart which has groceries and is a much larger and more profitable store. Any shopping center in its right economic mind would want to have a Walmart. Anyone in its right economic mind would want to have a super center Walmart because it's a bigger, better store, attracts more people. It has shoppers coming in not only to buy normal things in a Walmart that you would expect in a Walmart, but also groceries so that it attracts many, many more people. So this was not a permanent situation. In connection with the lease expansion agreement, what they were doing was they were taking over the 6,250 square feet by lease amendment. I think that's a critical component. If it were a separate lease, I could understand the district court's analysis. Why would a separate lease make all the difference? Because if it's a separate lease, then you have a separate parcel that stands on its own feet. But when you have a lease amendment, it becomes a part of the parcel. Okay, it would depend on the drafting of the lease. It would depend on how you worded the lease. I'm not sure I see that distinction as clearly as you do. Well, the lease amendment, it takes the original 141,000 square feet and says that lease is now 147,000 square feet. I don't know why a separate lease for a new space, which would basically be drafted in a separate document, would in reality relate back to the original lease and the original financing. I just am not sure that that would be that big a distinction. It's not that important. Yeah, I think that distinction is only important, Your Honor, for the open to the public issue because the Walmart space is open to the public. That's really our position there. But again, if you look to the purpose and intent of improving the lender's collateral, this improves the lender's collateral tremendously. The record shows that the owner of the center, Grand Properties, had the opportunity to lease this store, this 6,250 square feet, to other tenants, to a Five Below, which is a discount chain, to a Verizon. They could have leased it to a mom-and-pop pizza shop. They declined to do that because it enhanced their value and the value, therefore, of the collateral for the lender to have Walmart take over this space. And Walmart is now taking a store that's 141,000, taking over this 6,250 feet, taking over the fashion bug space at the end of this year, and they will have, with the additions that they're going to add on, in excess of 180-some-thousand square feet in this shopping center. That enhances the value of the center. That enhances the value of the collateral. That satisfies the underlying purpose here of the leasehold value. But there wasn't a specific clause in the lease or mortgage anywhere that specifically said this year, You're saying that this is the underlying purpose, but the district court's position was that he had to gather the underlying purpose and the intent just from the four corners of the lease. I think that's incorrect, Your Honor. I think that the district court was duty-bound to gather the intent from the four corners of the document in the context of a commercially reasonable situation. That's true. And, therefore, you need to look at what's going on. And what's going on here, Your Honor, is the borrower thought that the money should be released. The lender thought that the money should be released. And I think that's a critical component. CIBC, the original lender, was asked by the master servicer. Wells Fargo wrote them and said, We're confused by these documents. They're complicated. We're not quite sure what they mean. Here's our analysis. What do you think? And they wrote back and said, We think the money should be released. The master servicer, Wells Fargo, then wrote an analysis saying, We recommend release of the money. So the borrower, the lender, and the master servicer all said we should release the money. Who said they shouldn't? There was, with all due respect to this young clerk who was working on the file for the special servicer. I'm sorry, Your Honor? Mrs. Barber? Barker. Tej Barker. And I commend to the court the deposition that we took of Ms. Barker. It's astonishing. She said, My purpose is to divine the intent of the parties to the document. Yet she disregarded the intent of the parties and went through a stilted analysis designed, from the outset, to deprive them of the release of the money. You're right, Your Honor.  Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the court. My name is Ryan Maloon and I represent the appellees in this case. As the court noted on the appellant's argument, the key factor in this case is, did Grand comply with the conditions precedent for the release of funds? The most important of those conditions was this. Conducting business with the public. Correct. And the appellant chooses to call it the open to the public requirement. But the document doesn't say that. Well, what didn't they? Aside from the estoppel letter, what strikes me is, I'll call it a red herring, I think your colleague referred to it as a rubber chicken. I've never seen that term in a brief before. But aside from the estoppel letter, which may or may not be so germane as to be a condition precedent, what didn't they comply with? They didn't comply with three out of the four requirements in the approved tenant occupancy conditions. The first one that they didn't comply with was that they take actual possession and occupancy of the premises. Now, they argue that signing a lease is occupancy, but that's not the case, because under the approved tenant's occupancy conditions, it refers to signing a lease. That's one of the parts of it. The second part is taking actual possession. What was in that 6,600 square feet of space? What was in there? The place was completely empty except for at the time the inspection was done, and I attended the inspection, Your Honor, there were two pallets of ice melt within that space. And you're talking about a 6,000 square foot space with two pallets of ice melt. And from that, the appellant is claiming that it's used for storage. But in the course of discovery, the appellee subpoenaed Walmart itself and specifically asked, what do you do with this space? And as part of the record, Matt Sitton, the senior director of real estate for Walmart, submitted a declaration saying specifically, Walmart has not utilized the vacant retail space to support its retail operations in any manner, nor has it used the vacant retail space for any type of storage. But to say it's not utilized the space to support its retail operation and it hasn't utilized it in any manner is not the same as saying that Walmart hasn't taken possession of the space. Well, with regard to possession of the space, it's helpful to look at the other leases in the retail space. And in that regard, the other leases refer to a condition in the leases that requires them not to – in other words, it requires them – And the minute you do that, then you're beyond the four corners of this agreement. This is a summary judgment. The minute you do that, that's the argument you make to the trier of fact. But it just seems to me that when you're talking summary judgment, and we've got this dispute now about, well, did they possess it or did they not possess it? Are two pallets worth of snow melt or whatever was in there, is that sufficient to comply with the intent of the agreement? How do you get summary judgment out of that kind of dispute? Well, Your Honor, the two pallets of ice melt alone do not end up meeting the requirements of the approved tenant occupancy conditions because it says specifically that the tenant must be conducting business with the public from the space demise. It's not you're open to the public. It says conducting business with the public from the space. And that's important because the space is completely empty. It's unfinished. There's no lights or signage. The exterior windows are covered over with brown paper. They're certainly not selling the pallets of ice melt to the public. In fact, the doors are locked during business hours. No customers can come into the place. So in that regard, based on the evidence and the actual condition of the property during the inspection, it's clear that Walmart, the tenant, is not conducting any business with the public from the space. What do we do with the fact that Wells Fargo thought that the condition for the release of the holdback had been satisfied? Is your colleague, Mr. Grifferman, inaccurate when he states that Wells Fargo said, yeah, we think that they've met their conditions? Well, what Wells Fargo said in their e-mail correspondence was that they didn't – that Grand and the tenant, Walmart, didn't technically comply with the requirements, but they said, you know what, it's Walmart, let's make an exception. But it wasn't their decision to make. It was CW Capital's decision to make. Grand also pointed to an e-mail from CIBC, the original lender under the loan, that also said – Well, doesn't that go to the intent? If that's what Wells Fargo said, and they're the master servicer, and they say, well, look, it's Walmart. As far as we're concerned, given the intent of this deal, we got into this very complicated and elaborate structure only to make sure that our $14 million loan was protected. As far as we're concerned, our money is protected, released the funds, make the disbursement. Why wouldn't that be significant for a trier of fact to consider in determining whether or not there's been substantial compliance with the requirements for the disbursement? There's no evidence in the record that the trier of fact didn't consider it, but what I would say – There's no trier of fact. It's summary judgment. That's my point. There's no trier of fact here. Well, the judge was looking at all the evidence and saying that there's, as a matter of law, Grand did not comply with the requirements under the mortgage. Now, Wells Fargo opinion to essentially deviate from the terms of the mortgage because Walmart was not conducting business from the public – excuse me, with the public from the space, that deviation under the pooling and servicing agreement, which is the only contract that binds the lender to the servicers, both the master and the special, requires that deviations from the mortgage need both master and special servicer approval. So ultimately, this holdback and the release of funds have to be determined by CW, and that was their job as a special servicer was to determine – Does a special servicer have a financial incentive to not release the holdback funds? No, Your Honor, and I know that there was some argument related to that, but in the declaration submitted in support of the motion, Greg Aikens, one of the vice presidents at CW Capital, said they don't make any money. They specifically don't make any money with respect to a holdback, but even more so with respect to this loan. Because it's a performing loan, CW Capital doesn't make any money servicing that loan. The difference on the interest spread that is argued is inaccurate or not material, then? Well, that spread of the interest, if any, doesn't benefit the servicer. It benefits the lender and more specifically the trust, the pool of mortgages within the trust where the mortgage is contained. But there's no incentive for CW to keep the holdback. In fact, six months earlier – Why? Isn't it getting interest on that money? What happens is all those mortgages are pooled within a trust, and those interest and payments get pooled within the trust that eventually get paid out to the certificate holders. But CW Capital, as the servicers, it's essentially like providing a service, and they get paid for the services they provide. What's the basis of the pay? Is it a flat rate? Does it depend on the amount that they have control of in the fund? Well, I think that the entire loan, the $14.6 million that they loaned to Grant, they're collecting interest on that entire amount. So in a sense, you could say that they're receiving interest on money that they haven't dispersed yet, but that's specifically what the agreement requires. And as Your Honor pointed out earlier, this is a standard agreement. In situations like this where there's an open space that needs to be leased up, the lender typically provides an incentive to the landowner to get businesses into their space and have them conduct business so they can generate revenue and contribute to the viability of the entire center. If Walmart was conducting business with the public from the space demised, the additional 6,250 square feet, then would the holdback be released? Yes. I think if Walmart was conducting business from that space, yes, the holdback gets released. But here, they're clearly not. So you're not defending the district court's opinion with respect to the finding that the lease amendment related back to the original signing and therefore could not be a new approved lease under the agreement? Well, I think there's, you know, I think that's yet another reason as to why the holdback was... You are defending it. Hmm? You are defending it. Defending it in the sense that... You don't have to defend that. Defending it in the sense that, you know, we made that argument, the court adopted that argument, and I think under the terms of the mortgage... Because you sold that argument to the district court. They don't have to try to sell us that rubbish. Under the terms of the mortgage, you know, if you look at the definition of other real estate... You can have the whole place rented out and business being conducted... One square foot. One square foot. Every square foot, and have the business being conducted from every square foot, but they'd still not be entitled to it because they amended the lease as opposed to a new lease. Well, I mean, if you had the entire space rented out under separate leases, but if you're saying if Walmart decided I'm going to rent out the entire $25,000, keep it empty, or in your case conduct business, I think the argument is much stronger. And I think the critical condition that wasn't met was this conducting business with the public from the space. And on that point, to go back to what I was saying earlier, in February of 2009, Grand made a request for a disbursement related to a pizza shop, incidentally, that rented about 1,200 square feet of space. The request was made in February 2009, but the lease was entered between Grand and the pizza shop in May of 2008. So the question is why wait nine months? The reason is because until February 2009, the pizza shop wasn't conducting business. Once it was, the request was made. Twenty-eight days later, the servicer released half a million dollars for a pizza shop. So there's no evidence of the record with respect to the course of dealing that the servicer wants to keep the money. It just has to comply with the mortgage provisions. And when Grand made the request in August, it was well aware of the conditions. Having made a request for a lease six months earlier. Mr. Brevin might take umbrage at your comparing the real steak and pizza with Wal-Mart. Well, I think, obviously, real steak and pizza, as compared to Wal-Mart, I mean, there's really no comparison with respect to the businesses. But I think that just proves the point even further, because they were willing to release these funds. Grand has argued there was some, you know, hidden agenda, if you will, to keep the funds, you know, held back rather than dispersing them. What should we make of this thing? I can't remember whose testimony it was. Maybe it was Mrs. Barker, who was asked about the time limit. She didn't comply with the time limit in the lease in response. Oh, we never comply with those times. I don't pay attention to those time limits. Well, the time limit in the mortgage specifically says that disbursement requests shall be received at least 10 days before any disbursement. Now, under the mortgage, a disbursement request is defined as a defined term. That's the written request for money. And a disbursement is separately defined as the actual payment of money. And the key language in that provision that I just referred to, which is 1.28G of the mortgage, is that it says at least. It doesn't mean you're going to analyze a disbursement request within 10 days. If they wanted it to be within 10 days, they certainly would have said within. They said at least, which means you have more than 10 days. Now, if CW had taken months and months and months to process this request, maybe there would be some argument about improper conduct or what have you. But didn't they? Isn't that what happened here? No, what happened from the time that CW received the request, which was October 6th, 23 days later they informed Grants Council that the request is denied because you did not meet the approved tenant occupancy conditions, and they specifically cited the condition that they weren't conducting business with the public from the space. So it was 23 days from the time that CW received it to the time that they actually denied the request. I think here, Grand entered into this lease with Walmart of their own accord. It was their own decision. They were represented by counsel when they were negotiating with Walmart and certainly when they were trying to get the release. Grand is run by sophisticated businesspersons who have over 60 years' experience in the real estate development industry. None of the defendants were involved in this process with Walmart or the negotiations with Walmart. They were just faced with what they were given at the end of the day, and it was Grand's own choices that resulted in their own failure to comply with the mortgage and the release requests, and the district court specifically found that, and we feel that because Grand didn't comply, the district court's decision should be upheld on this appeal. Thank you, Your Honor. Thank you very much. Got a very good opponent sitting over there. Absolutely, Your Honor. Cleaned our clock down. You eat your rubber chicken. Yeah, the guy's right down there. Right there. Do you see it? Yes. I'm sorry? No, it's not. Oh, I see it. I'm just looking for the clock. The one that Mr. Moulin cleaned. A couple points I think are important to bring out. Maybe you could really stress, maybe this is where you're going, the issue about they weren't conducting business from the space, which really seems to be a very strong argument Mr. Moulin made. Walmart was conducting business from the space. And what were they doing to conduct business from the space? It was part and parcel of the 147,500 square feet that they had leased. It was no different from any space they had in the back. It was no different from a warehouse that they had in the store. But Your Honors, I think, have zeroed in on the issue, and that is what was the purpose. And this lease, not only, this lease amendment was not executed in a vacuum. It was executed in the context of a lease expansion agreement so that the lender well knew exactly what was being done here. This was part of the expansion that was going to ultimately, and now it's even getting bigger, but ultimately result in 181,000 square foot Walmart store, which is going to take over about 12,000 of this quote of the real estate. You said that they were conducting business from the space. Does that mean that we could go into that physical space and buy a Walmart item? Is that what you mean? What do you mean they were conducting business? What I mean, Your Honor, what I mean, Your Honor. Could I go in and, I don't know, what does Walmart sell? Everything. Everything. Could I go in and buy everything? What I mean, Your Honor, is that because it was an amendment to the Walmart lease, and the Walmart lease was this huge ground lease for the entire store, that 6,250 square feet lost its character as separate space and became part and parcel of the bigger space. Was it physically part of it? Was there a separation? There was a separation. Like a wall? There was a separation that was going to evaporate, Your Honor. Going to is not the same as conducting now. But they were conducting it because the deal was structured as a lease amendment. And if I may, Your Honor, it lost its character as separate space. Basically, it's the same. You could say technically they're not conducting business from the restrooms either because you can't buy anything in the restrooms. Correct. But it's part of the overall space. Correct. Exactly. And I know that I'm running out of time, but I just want to point out to the Court that there are two really critical documents. One is prepared by Wells Fargo. It's called the Consent Action Plan. And in that, they say that Walmart has full rights to the space under the lease. The space cannot be marketed to the outside. Walmart is paying full unabated rent and prorated expenses, and no outside costs are associated with tenant improvements or leasing commissions. Also an important point because there was no TI expense that the landlord was going to have to incur. Excuse me, TI? Tenant improvement expense that the landlord was going to have to incur. Then it goes on to say that Wells Fargo, as master servicer, is recommending approval of this transaction. Now, this was a lease. The lease amendment was submitted to both Wells Fargo and CW for their approval, not in connection with release of the holdback, but for simple approval of the lease. And when they approved it, and both of them did, Tej Barker, who was the analyst assigned to this loan from CW, did a DSCR, a discounted, I mean a debt service coverage ratio analysis, which showed that the debt service coverage ratio was met. However, a month later when she was doing the analysis for the release of the holdback, she found that it wasn't met. And she used all kinds of incorrect analyses. She used the wrong dates for the Five Guys lease. She used the wrong dates for the Walmart lease. She considered it to be a principal, an amortizing loan, principal and interest, when in fact it was interest only. Those analyses, which were diametrically opposed to that which she did in the context of the lease improvement, resulted in her finding that there was no DSCR met. Now, was there a financial incentive for the special servicer to not approve this release? We believe there is, Your Honor. We have filed a motion to supplement the record to include the entire PSA, which is that servicing agreement. Section 3.11 of that agreement specifically deals with compensation to both the master servicer and the special servicer. I believe the special servicer is in Section B. Excuse me. The other document that I wanted to point out to the Court is in fact the document prepared by Tej Barker, which is prepared on 10-6-2009, saying due date 10-28, Consent Review Summary, and in it she says, first of all, based upon our conversation with Mike McCoy, who was their lawyer, the First Amendment to the lease that was approved is part of the ground lease that has been in place since 2007. Walmart is paying ground rent for the 142,000-square-foot pad site, which is part of the collateral and is open for business to the public. Let me ask you about that. I'm trying to literally figure out what this looks like. If you go into Walmart, you go in the door right at the beginning. Yes, Your Honor. Can you walk through? You said there was a separation. Can you walk through the entire thing without? To get to the 6,250-square-feet? Yes. No, Your Honor. The three stores in between or two stores in between? Two stores in between, which are now obliterated because it's all becoming part and parcel of the whole thing. But under the district court's analysis, because it's other real estate, it was not executed after, we'll never get this money. His opinion effectively frustrates the purpose of the party's intent. Thank you. Thank you, Your Honor. Very fine argument on both sides, Mr. Bairdman. I know I have not seen you before, Mr. Malone. I don't think I've seen you before either, but I hope you come back. It's really very, very well done. Thank you.